Sunbelt Surface Transportation Board Mr. Martin Yes, good morning, Your Honors. May it please the Court, Craig Martin on behalf of Sunbelt. As Your Honors know, we seek a vacation of the STB decision and a reversal and a remand for further determinations with regard to the reasonable rate structure. There's really, let me get to the chase in terms of the two points. There's really two points with regard to the appeal. One is the adoption of operating assumptions in the operating plan, not as the result of analysis, but as a result of the adoption of a hump yard. And the second point that's really in the briefs is the allowance, what we would say is the allowance of a barrier of entry via a mortgage calculation as opposed to a coupon rate calculation with regard to interest and taxes. I'd like to take those in reverse order, if I may. With regard to the barrier to entry point. There's plenty of time for the other issue because I think it's much closer. Okay. I will. With regard to the barrier to entry point, the structure of the stand-alone SARR is 24 percent debt, 76 percent equity. With respect to, just to clarify something in the briefs that is just so that you've got it, there are two tables that are referenced in the briefs, table E and table I. Table E is a calculation with regard to interest and mortgage. Table I is a discounted cash flow calculation. For the discounted cash flow calculation, all of the parties, including the board, use a coupon method. So that's not at issue. What is at issue is the interest amortization schedule, which is the tax issue, and Sunbelt uses coupon. Let me tell you right off why I think this is a very complex case, and I don't know the answer for sure. But it seems to me that your argument on this debt amortization issue is flawed for this reason. If you, in your calculations, calculate a rate which does not take into account at all the repayment of the assets, it seems to me that you are just violating a fundamental tenet of the stand-alone cost test, the SAC test. And the rate that would result from that would have the railroad, the hypothetical railroad, at the end of the how many of years we're talking about that it calculates, there would have been no monies from that rate to go toward amortizing the principle of the debt. And that seems to me to just be wrong, and therefore the board is correct in requiring that there be some amortization of the asset cost itself. Thank you, Your Honor, because you get right to the issue. And our view with regard to that is there is certainly case law under the SAC test that stands for the proposition that you have to pay off the building price, right? Just like I have to pay off my student loans as opposed to fold them into my mortgage, to use a real example. In terms of, there's another principle, however, in the stand-alone cost test that is enshrined in the case law and in the briefs, and that is that there should be no barrier to entry. And operating railroads operate under a coupon method. Is there any case where the board has allowed a shipper to use a debt amortization plan similar to the coupon method that you propose? I think that there are situations that go both ways, Your Honor. In terms of this particular situation, the coupon method allows you to, and I'm not, to be more clear. There are certainly, for example, in the DCF situation, right, you're using a coupon method. In the tax amortization method, they use a mortgage interest method. In terms of, so there are certainly occasions in which a coupon method is used. Our whole point with regard to this is there is a barrier to entry. I understand your point, but my question was a lot more specific. Is there authority that the board could have relied on to allow you to use the method that you're advocating for? I'm not sure of authority that goes one way or the other on this particular point. I'm trying to understand, if there's no authority, how could it be arbitrary for the board to rely on its prior precedent? Because it erects a barrier to entry with regard to this situation. Is it not the very test is a barrier to entry? I mean, the very fact that the hypothetical railroad has got to build all these tracks is a barrier to entry. I mean, they could have done something like they did with AT&T and require the telephone monopoly to share their lines, but they didn't do that. And you're not challenging that. I think the barrier was already there. I'm going to move to my second point. Or actually, our first point. The first point that we were trying to make is this. With regard to the hump yard. Okay. As a result of the hump yard, all of the operating assumptions in the RTC plan, the Rail Traffic Controller Plan, are adopted. So once the board adopts a hump yard, a series of dominoes falls with regard to the RTC plan. Let me tell you what I think about this. Okay, please. You'll have some time. It does seem to me, and I'll be wanting to ask Norfolk Southern and the board, whoever is on the other side. It does seem to me you've got a very, very strong argument that the refusal to simply substitute might be arbitrary because there are, or there may be, I'm going to ask them, as you say, no downstream differences between what the hump yard would have produced in the RTC analysis and what you did because the inputs were the same. What bothers me about your case in that regard is, number one, assuming you're right, which I don't know, but assume that. I think it's a strong argument you waived it because you did not argue it at all until the petition for reconsideration. And even in your petition for reconsideration, while you do argue that the inputs were the same with respect to traffic volume, dwell time, and maybe one other thing, I can't remember, but what you did not say in your petition for reconsideration was that the input with respect to the number of tracks was the same, namely three, three receiving and three departing. And the board's answer, the board's decision on reconsideration relied precisely on that, that the number of tracks were different. And in fact, it thought that there weren't even a full three in the flat yard. But why have you not waived it? You didn't bring it up until the petition for rehearing and then you didn't tell the whole story, even then. Well, there's a lot of stories told in this record, Your Honor. And with regard to its, to be quite blunt, it's amazing that the board got this wrong because it comes right from the RTC model. And both parties used three coming in and three coming out. And we point that out in our opening brief. For the first time in these proceedings. When we focus on three and three, that is when we're focused on three and three. In terms of the record, it is in the record below. And we point that out, I think, on page 33, footnote 10, where it's in the record of our opening brief. But with respect to the way it unfolds in front of the board, is we certainly see the argument considered in the dissent by Commissioner Bergeman, I think it is, who says the majority used that as a basis to impose hundreds of millions of dollars of costs on the SARR. So in terms of the fundamental premise, and that is, you know, the fundamental premise is basically, can you take the hump yard out and then, you know, put it back into a model to run the RTC? And in the dissent, it is clear that the dissent identifies that as an issue from the briefs and the modeling that was done before it. Because the dissent clearly identifies the issue of whether it can come out. It may be that the dissent identifies that. It doesn't mean that it necessarily flowed from anything that had been argued. It may be something that the dissent raised on its own for the first time. It is not clear to me where the dissent would have picked that up on anything that had been argued before. I think it comes straight from the modeling that the parties had done. Because it is an expert agency that is knee-deep, shall I continue? It is an expert agency that is knee-deep in the modeling that is done. And if you dig into the modeling that is done, you should be able to tell whether or not you can essentially lift the hump yard out. We in below, Sunbelt in the petition for reconsideration, says that the board can and should have substituted the hump yard for Sunbelt's flat yard in the operating plan. And that it is not until the reconsideration decision comes out that you can see that the board completely gets the factual record wrong. And they don't explain it at any time prior to that. You say in the petition for rehearing, petition for reconsideration, you say that it would be easy to put the substitution of the hump yard in and that the output of the RTC analysis will be the same. And you go on to say why. Number one, because the same traffic volume was put in. And number two, the same dwell times were assumed and put in. But you do not say the crucial fact that the receiving departing tracks input by both parties was the same. You don't say that. And that is why the board may be wrong, that one thing. Your Honor, it's, I have the brief in front of me. You're absolutely right. So you're reading with regard to, it's JA 1243 in the record. In terms of the, it is clear that our, that Sunbelt says to the board that you can lift out the hump yard and it models to the RTC. I can't recite for you all of the factors that go into that in terms of why it is you can lift it out and so forth. But embedded in the record and embedded in the expert reports that are done for the board, which itself is an expert agency, are all of the underlying assumptions. So they have a record in front of them that is quite voluminous with regard to this and they can lift it out. I see you're consulting. I will sit down unless there's some other question. Thank you, Mr. Martin. You've saved five minutes for rebuttal. Thank you, Your Honor. Mr. Reed. Good morning. May it please the court, my name is James Reed and I'm appearing today on behalf of the Surface Transportation Board and the United States government. I'll be sharing time with counsel for the intervener this morning. The SAR constructed by a complainant must have an operating plan that works. Sunbelt's operating plan, however, could not work. It did not have an adequate facility at the Birmingham yard to provide classification and blocking for the traffic it intended to serve. Over 90% of the traffic on this system moved through the Birmingham yard. Let's get straight to this issue we were talking about. It seems very likely to me that the board was, in fact, in error in thinking that the output, downstream output from the RTC analysis would be different if you used the hump yard and just substituted it into Sunbelt's operating plan. Is there, do you concede that they were wrong in that regard or do you think that they were still right? It's a contextual question, Your Honor. And let me start by saying, yes, the board was in error in the example it gave of the difference between receiving and departure tracks as modeled in the RTC model itself. What I want to do is back up and talk about this case, however. That is not the only issue that has been raised by Sunbelt on appeal here. They've raised the issue of whether the board erred in terms of adding or selecting, allowing NS to submit an entirely new operating plan. They've raised the issue, this primary driver argument that they raised for the first time on appeal, which has, in the reply brief, morphed into an RTC model input argument, which the board has never seen before. They talk about the board should have required supplemental evidence on the case, which we do not believe was necessary. Let me tell you. I'm a little bit inclined to think the board is right on all of those things except the one. Except the Humpyard. Except the Humpyard substitution issue and the board's ruling on reconsideration that the RTC output downstream would have been different. And it seems to me very likely that it would not have been different. Therefore, they could have, the board could have simply substituted the Humpyard into Sunbelt's operating plan. And because Sunbelt's input with respect to the Humpyard, with respect to the Birmingham yard, the input was exactly the same as Norfolk Southern's input. The RTC analysis should not be different because of the Humpyard substitution. Is that right or wrong? Well, that would be incorrect, Your Honor, and here's why. The broader point remains. The RTC model is this very complex simulation. It's actually a computer model in which you have tracks built, so you have to put in assumptions about your infrastructure. Do you double track? Do you single track? Do you have sidings? Do you have yards? And you have to model how the tracks interact with your yards, in this case the Birmingham yard. Then you have to move your trains and put in assumptions about the train speeds as the trains move around the system. And you can vary those. You can move them quickly, adding more engines, or more slowly if you're trying to time them. Then you have to deal with bottlenecks that get created in the system. So the board, when it was talking about the complexity of the RTC model, it's not only just modeling how the trains move into the Humpyard, but you also have the timing of when those trains come back out of the Humpyard onto the system. And you have to make— So you're telling me that your opponent is wrong in their argument that the downstream output of the RTC analysis would be the same even if the Humpyard was simply substituted into Sunbelt's operating plan? You're telling me that they are incorrect, Sunbelt is incorrect, in arguing that the RTC analysis would necessarily be the same? That's correct, Your Honor. Okay. So the RTC model needs to be optimized. The problem is there's no one answer. There's no perfect solution to the problem. So the board requires the parties to develop the RTC models, and then the board selects from the RTC models. And it's an adversarial process. And as you pointed out when you were talking to Mr. Martin earlier, they never provided an analysis of how the Humpyard would operate within their own operating plan, even on reconsideration. And they don't raise that Humpyard substitution argument until reconsideration, right? That's correct, Your Honor. Now, does the board fault them for having raised it for the first time then when it denies reconsideration? Very much so, Your Honor. At page 6 of the reconsideration decision at the joint appendix at 1342, the board says specifically in regard to this argument, some that may not now claim error by adopting an argument it opposed throughout the case. So on reconsideration, the board both held that they were wrong and that the output would be the same. And, of course, they said they were wrong for the wrong reason, according to you, namely that tracks were different. But then they also ruled in an alternative ruling waiver. Correct. That's correct, Your Honor. And I would point out the board's error is that's the first part of the board's analysis. But the board goes on to talk about the other impacts of the Humpyard being inserted. And it talks about other factors which the board didn't have the record on which to make that decision, and including the road property and investment decision. So the parties argue about everything from how much does it cost to build a track, how much does it cost to build a switching place where tracks cross, how much does it cost to build the building and facilities for the yard crews that operate, and none of this was on the record. And clearly the Humpyard was different from a flat yard that Sunbelt had proposed, including in its evidence. I have a question about the procedure that the board followed. You argue that the footnote in Duke Energy requiring a railroad to make a motion to the board is limited to situations where the shipper's evidence is impossible to respond to. And here the board found that because Sunbelt left the Humpyard out of its plan, there was nothing for the railroad to reply to. So doesn't that mean that the Duke Energy footnote applies here and the board should have required the railroad to make a motion rather than allow it to submit completely separate new evidence on its own? There's another case out there called General Procedures, which sort of helps set out how the evidentiary submissions are supposed to be made in SAC cases. And what it basically says is the railroad is limited to replying to deficiencies in the shipper's evidence. And that's what the railroad did in this case, Your Honor. The railroad looked at an operating plan and the impact of no Humpyard was no blocking and classification in intermediate yards on their opening evidence. And specifically, Sunbelt admits to that error and tries to correct it on rebuttal, but not sufficiently because they didn't include the Humpyard so they didn't have the facilities necessary for blocking and classification. All NS did was critique that evidence. So under the board standard in Duke NS, if you actually look at the evidentiary standard, the shipper, if it submits infeasible or unsupported evidence, then if the railroad submits feasible and realistic evidence in its reply evidence, the board will use that evidence, and that's exactly what happened here. So the NS in terms of critiquing, the Duke NS footnote is a little ambiguous. It doesn't say what sort of motion is supposed to be brought. Clearly, we don't believe that Sunbelt thinks they should have brought a motion to dismiss the case. That would have been contrary to their interests. But in this case, the evidence wasn't so flawed as to prevent NS from actually responding to the evidentiary submission with their own Humpyard, Your Honor. If I could, I have a few minutes and I'll just move to... Yeah, boy. Thank you, Your Honor. I'll move briefly to the tax issue then. I would start by saying, Judge Pryor, in your earlier question to Mr. Martin, you asked whether the board had ever allowed the use of a coupon method in a prior case, and the board has never allowed for purposes of calculating the tax shielding effect of the interest payments on the coupon method, has never allowed for the debt amortization as a home mortgage loan, as the petitioner in this case suggests. It's longstanding precedent that for purposes of calculating the interest, the tax shielding effect on the interest payments, the board requires a SAR to show that it can pay for its assets and therefore must pay down its debt. We believe that this barrier to entry argument was waived below because it was never raised. Because of the foregoing, we respectfully ask this court to deny the petition. Thank you, Mr. Reed. Mr. Warren. Good morning, and may it please the court. Matt Warren on behalf of Intervenor Norfolk Southern Railway Company. If I could begin with the Humpyard operating plan issue. The core of Sunbelt's argument is that the board erred by not making corrections to Sunbelt's operating plan that Sunbelt itself refused to make on rebuttal. The board has evidentiary rules that are specifically designed to give shippers a second chance to fix problems in their operating plan. After they hear the railroad's criticisms, shippers can then make a choice as to what changes they want to make in that rebuttal operating plan to present to the board because the board has made very clear that it itself will not be delving into the details of operating plans, weighing operating statistics. It's going to pick one party's evidence or the other. In fact, it's even more favorable to shippers than that because as long as the shipper's plan is feasible, it will be accepted. Regardless of whether the railroad's plan is better, if the shipper presents a plan that's feasible, that will be accepted. Here, Sunbelt failed to present a feasible operating plan, and that is not contested on appeal. There is not an argument here that a stand-alone railroad that did not have a humpyard at Birmingham, this keystone of the system, which would have to classify 1,200 cars a day, that it could operate without hump facilities. And it was not, it is not, you know, it has never been the board's policy that it will delve into operating plans and, you know, and mix and match items. And as the board explained in the decision, you know, one thing I think I'd like to point out, it wasn't just that the board didn't just have two rationales for its decision here. It certainly held that Sunbelt hadn't raised this issue on rebuttal and, therefore, it was waived. It also made an example, which the board concedes was incorrect, that there was a mismatch and that the RTC modeling of the Birmingham yard would have been different in the two parties, in the two parties' RTC simulations. But the board first said that when dealing with a yard of this magnitude, that this yard is simply, you know, too critical to the system for us to stitch into the plan. So I think there are multiple grounds, you know, for the decision. The failure to have a hump yard in Birmingham was so significant a flaw that the board simply didn't know what the effects might be. Yes, yes, I think that's right. And I think it's important to, you know, to understand how what's happening in the hump yard could affect, you know, other, you know, trained movements on the network. So when we're talking about blocking and classification, we're talking about, you know, what are the operations in that yard? If you have a train coming in that has traffic that's bound for 20 different customers, how are you going to block that and classify that and put it on other trains to move out? So, for example, in Norfolk Southern's operating plan, the blocking and classification plan influenced the train service plan because until you know what blocks have to go where, you don't know what, you know, trains are moving where. So it was reasonable for the board to consider these operating plans, you know, as a unit. And that was, you know, as we pointed out in our brief, that was how this case was litigated, you know, below that both parties knew that one plan or the other was going to be selected. One other point I'd like to make is that it's easy to get to overstate the impact of this decision. The board's decision has 60 pages talking about operating expense issues. It delves into many operating expense issues and is weighing the party's evidence on things like, you know, recruit rate and, you know, locomotive lease rates and staffing, you know, dispatching staffing. It is only that core set of operating statistics coming out of the RTC plan that are directly influenced by the operating plan decision. One other point I'd like to make, Judge Pryor, you asked about the Duke footnote. I think in the discussion it was assumed that it was the hump yard that was the failure in Sunbelt's operating plan to which Norfolk Southern did that, that gave Norfolk Southern the right to, you know, file or apply evidence. It was actually a complete absence of blocking and classification plan. There was no such plan provided on opening, and therefore the board held here, as it's held in other places, that that was a sufficient cause for the board to allow Norfolk Southern to present its own operating plan. And lastly, if I could, I should touch on the one issue that Sunbelt raised with respect to waiver, that Commissioner Begevin's dissent somehow preserved the issue. I think if you look at Commissioner Begevin's dissent in whole, and particularly look at that in connection with the opinions, with the concurring opinions by the other board members, it's clear that the board is talking about, you know, a general discussion of the SAC test and, you know, Commissioner Begevin's general concerns with the SAC test. She never suggests that, you know, the board had any obligation to stitch together a hump yard. Thank you, Mr. Pryor. Any questions? Mr. Martin, you have five minutes. Thank you, Your Honor. The three basic points. The first is, with regard to this notion of the RTC operating plan assumptions, if you look at it as there is a hump yard and then there is a set of RTC operating plan assumptions, and that's just a part of the overall plan. It's not the whole of the overall plan. The board does no analysis whatsoever to compare the railroad's operating plan assumptions once you get outside the hump yard with Sunbelt's operating plan assumptions. The record is completely devoid of any analysis of that. And the reason for that is because the board's decision with regard to hump yard is essentially like a domino and it knocks down the rest of the RTC modeling assumptions. So it is completely devoid of analysis. And, yes, we do not challenge a number of other decisions of the board because they are entitled to deference as an expert agency. But just structurally, that's the way the model works. With regard to the point, with regard to the Duke Energy point, and I think the Duke Energy case is the most on-point case with regard to how the procedure is supposed to work, the board has it fundamentally wrong if you look at the Duke Energy case. And there's not only the footnote, but if you look at the Duke Energy case, what the board's duty is to do is to look at the operating plan that is submitted by the shipper and analyze it in, ask this question, is it feasible? And the board is also supposed to look at which portions are feasible and which portions are not feasible. And that is what the debate is about with regard to the other side, the railroads just submitting an entire operating plan that essentially is the $6 billion gold-plated operating plan as opposed to the $4 billion operating plan or plan entirely. So with regard to Duke Energy, the appropriate way to do this was that the railroad should have come back and the railroad should have had an analysis for the board to analyze all of those RTC operating assumptions because they actually were divorced and could be divorced from the Humpyard decision. It seems to me you should have, instead of relying upon this logical argument, logical argument, Norfolk Southern and Sunbelt had the same inputs to the RTC analysis, therefore downstream would not, with respect to the Humpyard, therefore there wouldn't be a change. Seems like to me, instead of relying upon that logical argument, which the board obviously didn't accept, you should have rerun the RTC and demonstrated that. And then there might possibly have been a chance. And you just suggested that the board itself should have done that, but there's good case law that they are not obliged to do that. Why did you not rerun the RTC analysis with the Humpyard input that Norfolk Southern had used? So, Your Honor, there is, with regard to the modeling, the modeling right from the structure of the modeling comes out the numbers. So there was, for the RTC operating plan, right, there's just a distinction between the operating plan for the RTC that is the A operating plan that the railroad had and let's call it the B operating plan that Sunbelt had. There's nothing to do once you either accept or reject the assumption that the Humpyard is somehow impacting the RTC plan. The Humpyard, as we discussed and I think Your Honor picked up on quite astutely from all these briefs, right, there is three tracks in and three tracks out that are used for the RTC model by each party. And therefore, you can essentially lift the model right out. So what goes on in the petition for reconsideration is, you know, made the argument that a Humpyard was not necessary but then made the alternative argument that I read to you with regard to the record saying that you can clearly lift it out. Whether they identify each and every factor I don't think is necessary in order to preserve the issue. Thank you, Your Honors. Thank you. We have your case.